140 So.2d 487 (1962)
Marilyn J. LYCKBURG
v.
Berndt K. LYCKBURG.
No. 5309.
Court of Appeal of Louisiana, First Circuit.
April 9, 1962.
J. Peyton Parker, Jr., Baton Rouge, for appellant.
Kantrow, Spaht & Kleinpeter, by Robt. L. Kleinpeter, Baton Rouge, for appellee.
Before LOTTINGER, LANDRY and REID, JJ.
LANDRY, Judge.
Plaintiff herein, Marilyn J. Lyckburg, instituted this action August 5, 1958, against her defendant husband, Berndt K. Lyckburg, for a separation from bed and board and custody of the four minor children, issue of the marriage, namely, Joan Barbara, Betty Jean, Barbara Ann and Deborah Lynn, born August 13, 1941, December 28, *488 1942, September 7, 1944 and April 29, 1956, respectively. Following a long protracted trial during which a voluminous record of more than 1100 pages was compiled, judgment was rendered in the trial court February 11, 1959, granting plaintiff a decree of judicial separation but awarding care, custody and control of the hereinabove four named minors to their father, Berndt K. Lyckburg, defendant herein.
Plaintiff has appealed that portion of the trial court's judgment awarding care, custody and control of the children of the marriage to defendant. The sole issue before the Court on appeal, therefore, is the propriety of the action of the trial court in awarding custody of the children to defendant-appellee (the father) rather than to plaintiff-appellant (their mother).
The appeal taken herein was initially to the Supreme Court of this state and was by virtue of the revision of appellate jurisdiction effective July 1, 1960, subsequently transferred to this Court.
In the brief filed before this court learned counsel for appellant contend the trial court was guilty of dual error in (1) admitting in evidence a report of a social study made by the members and staff of the trial court with respect to the relationship and background of the litigants and (2) concluding that plaintiff was not a fit person to have custody of her children.
There appears in the record of this case a stipulation of facts enumerating, in more or less chronological order, the salient events and circumstances giving rise to the instant suit. A résumé of said facts and circumstances as appearing from said stipulation is deemed advisable at this point to afford a clearer understanding of the factual issues which are involved in this action.
It appears that plaintiff and defendant were married in Chicago, Illinois, June 15, 1940, and that of the union the hereinabove four daughters were born on the dates hereinbefore set forth. Following the marriage the couple resided in various parts of the country as dictated by defendant's employment as Chemical Engineer first in Chicago, Illinois and subsequently in Independence, Missouri, Akron, Ohio, Lake Charles, Louisiana, Beaumont, Texas and Reiffton, Pennsylvania, although not necessarily in the order mentioned. Defendant rose to executive level in his chosen profession and on or about December 1, 1956, he was offered the position of General Manager of a chemical plant situated in Baton Rouge, Louisiana, at a salary of approximately $19,000.00 annually. In early December, 1956, defendant commenced making frequent trips to Baton Rouge in connection with his new employment. The three elder children, Joan Barbara, Betty Jean and Barbara Ann (then aged approximately 15, 14 and 12 years, respectively) were sent to Villa Park, Illinois (near Chicago) to live with their paternal grandparents and subsequently on December 28, 1956, plaintiff and the youngest child, Deborah Lynn (then approximately 8 months of age) left Pennsylvania to visit in the home of appellant's parents situated in Miami, Florida, her departure being prompted to large extent by service upon her of a summons to appear before a lunacy commission convened upon application of defendant to hear the matter of plaintiff's sanity. After establishing herself in Florida, plaintiff flew to Illinois, took custody of the child Betty and brought her to Miami where she was enrolled in school. Meanwhile the two remaining children, Joan Barbara and Barbara Ann, entered school in Elmhurst, Illinois. Plaintiff, who for some time had been threatened with a nervous breakdown, eventually was placed in a private mental hospital in Miami, Florida, on or about February 5, 1957, and remained there undergoing treatment for mental illness until discharged therefrom May 11, 1957, at the insistence of defendant who felt that he was no longer able to bear the financial burden incident to plaintiff's treatment in a private institution for the mentally ill. During plaintiff's hospitalization defendant repeatedly assured her he desired her presence in Baton Rouge, *489 Louisiana, so that plaintiff might be with defendant and the children, despite the fact that on January 14, 1957, defendant instituted proceedings in Pennsylvania against plaintiff for divorce. Upon plaintiff's release from the hospital in Miami, Florida, she accompanied defendant to Baton Rouge where the couple resided together until May 15, 1957, in an apartment secured by defendant. However, on May 15, 1957, plaintiff, upon application and affidavit of defendant, was committed to Southeast Louisiana Hospital, Mandeville, Louisiana (a public institution for treatment of the mentally ill), where plaintiff remained confined until November 22, 1957. During plaintiff's hospitalization at Mandeville, defendant rented a home in Baton Rouge, Louisiana, beginning occupancy thereof in approximately mid-June, 1957. Commencing in August, 1957, plaintiff was granted frequent weekend leaves from the hospital and at least one "pass" of eight to ten days duration which leaves and pass she spent with defendant at the family home in Baton Rouge. In the interim, however, more particularly on September 7, 1957, judgment was rendered by the Pennsylvania court decreeing an absolute divorce between the parties. While a patient at the hospital plaintiff was apprised of the pending divorce suit. Subsequent to her release from the institution at Mandeville, plaintiff, upon advice of her physician, went to Miami, Florida, to convalesce in the home of her parents. On May 29, 1958, plaintiff instituted proceedings to annul and set aside the Pennsylvania divorce obtained by defendant and as a result thereof on July 25, 1958, the court entered a judgment in plaintiff's favor cancelling, annulling and setting aside the divorce obtained by defendant. Meanwhile, on or about May 13, 1958, plaintiff returned to the family home in Baton Rouge, Louisiana, where she remained until May 30, 1958, on which date she was forcibly evicted therefrom by the police upon the representation to them by defendant that plaintiff was no longer his lawful wife. On June 5, 1958, defendant was married in Woodville, Mississippi, to Mrs. Tommie Cocke. Although the record does not conclusively show that defendant possessed knowledge of the pending annulment action instituted by plaintiff in Pennsylvania prior to defendant's marriage to Tommie Cocke, it does contain evidence from which such knowledge on the part of defendant may be reasonably presumed.
As previously stated the instant action by plaintiff to obtain a separation a mensa et thoro and custody of the children of the marriage was instituted August 5, 1958. The trial court awarded custody of the children pendente lite to defendant with certain specific visitation rights accorded plaintiff. After trial on the merits permanent care, custody and control of the children was given to defendant. Plaintiff having been hospitalized during most of the year 1957, for all practical purposes has, therefore, not had custody of her children for a period of approximately five years except for the visitation privileges afforded by the trial court.
At the outset it should be borne in mind that we are here concerned with an initial award of custody and that, under such circumstances, it is the settled law of this state that the mother has paramount right to custody and will not be deprived thereof unless proven unfit to discharge such trust. Sampognaro v. Sampognaro, 215 La. 631, 41 So.2d 456. Equally applicable to the instant case are the principles that in cases involving custody of children, the primary concern of the court is the welfare and best interest of the children and the mother should be awarded custody of young children unless she is shown to be morally unfit or otherwise unsuitable, Boatner v. Boatner, 235 La. 1, 102 So.2d 472; where the mother of a minor child is not shown to be unfit, she is generally the preferred parent in a matter of custody, Hathorn v. Hathorn, 237 La. 554, 111 So.2d 770; parents have a natural right to the care and custody of their children but such right is not absolute and must *490 yield to the superior right of the state to promote, preserve and protect the moral, mental and physical welfare of children, Dungan v. Dungan, 239 La. 733, 119 So. 2d 843.
In the instant case there is no issue regarding the moral fitness of plaintiff as a proper person to care for her minor children. There is not one shred of evidence in the record concerning any immoral activity whatsoever upon the part of appellant herein. Defendant, as father of the children involved, maintains that plaintiff is unfit to be granted custody solely and only because plaintiff's mental illness and instability renders her incapable of properly caring for the children. Defendant further maintains that not only is plaintiff unsuitable because of illness but also that the three older children have developed an animosity toward plaintiff and have expressed the definite preference to remain in the custody of defendant and, therefore, they should not be compelled to live with plaintff against their desire.
The record in this case is replete with mutual charges of incompatability which it would serve no useful purpose to set forth in detail save and except insofar as may be necessary to support the conclusion herein reached. It appears that this couple's troubles commenced shortly after their marriage in 1940. In essence plaintiff charges that defendant has been repeatedly guilty of infidelity and that defendant's demanding, overbearing attitude and insistence upon having his own way has been the basic cause of their admittedly frequent "fights". On the other hand, defendant assumes the role of the long suffering husband who for some years has known that his wife was mentally ill and attempted, without success, to persuade her to accept psychiatric treatment. According to defendant, in desperation he sought the Pennsylvania divorce to protect the children against the unwholesome influence of their mentally ill mother who rejected all suggestion of treatment. Defendant admits certain indiscretions but inferentially blames their occurrence on plaintiff's condition.
It is conceded by both parties that their disagreements have been frequent, forceful and, on many occasions (particularly while residing in Pennsylvania), in the presence of the three older children, Joan Barbara, Betty Jean and Barbara Ann. During these altercations both plaintiff and defendant directed insulting, vituperative remarks to each other and almost invariably the arguments ended in violenceplaintiff striking defendant as well as defendant assaulting plaintiff. On numerous occasions the altercations between plaintiff and defendant reached such proportions that police were summoned to the family residence sometimes by defendant and occasionally by neighbors. On at least one occasion defendant caused plaintiff to be arrested and detained overnight at a police station in Pennsylvania.
Defendant maintains that plaintiff, by virtue of her unstable mental condition, is unsuited to have care and custody of the children. He specifically contends that on numerous occasions plaintiff's conduct was so irrational as to repeatedly embarrass and humiliate the three older girls and that such instances occurred so frequently that plaintiff has completely alienated the affections of these three children. In this connection the children, Joan Barbara, Betty Jean and Barbara Ann, testified in substance that they no longer loved their mother and did not wish to live with her although all three stated they would reluctantly go with plaintiff if ordered to do so by the Court. They stated in effect that the reason they no longer wished to live with plaintiff was that plaintiff continually and repeatedly embarrassed them in public. In essence they contend that plaintiff was "too strict" and would not permit them to live normal lives and play as other children. They conceded, however, that while living in Pennsylvania, they were afforded dancing and music lessons, attended parties and *491 were permitted to have their friends visit in the family home. They preferred to live with defendant and their step-mother because the latter were nicer to them and permitted them considerably more freedom. Their testimony further reflects that their obedience of defendant is prompted more by the fear of corporal punishment than any other factor.
The incidents relied upon by defendant as proof of plaintiff's mental instability (and by the three older children as the source of embarrassment and humiliation to them) may be summarized as follows: (1) The frequent fights between plaintiff and defendant resulting in the summoning of police to the home; (2) An incident in Pennsylvania in which the three older girls were to participate in a dance revue and plaintiff arbitrarily refused to permit them to perform in turn but later interrupted the performance of other children so that her own might then render their numbers when plaintiff thought the time proper; (3) An occasion on which plaintiff while going out for an evening's entertainment brought laundry along and at approximately midnight raised a scene because defendant refused to drive out of his way at such a late hour to deliver the clothes to the laundress; (4) An instance when plaintiff arbitrarily spent the night in the car away from home together with one of the children; (5) Plaintiff's persistent refusal to permit the children to play with other children and engage in normal childhood pursuits of their own choice; (6) Plaintiff's alleged assaulting of the younger child, Barbara Ann, by stepping on the child's back to forcibly prevent her leaving home to attend school; (7) Plaintiff's alleged stating in public at a school function in Baton Rouge that defendant's second marriage was a nullity and that defendant and his second wife were living in adultery; and (8) A scene precipitated in a Baton Rouge cafeteria (during a visit of the children with plaintiff pursuant to visitation privileges granted by the trial court herein) in which plaintiff publicly reprimanded Betty Jean and because of the child's resentment of plaintiff's disciplinary efforts, plaintiff turned to strangers at a nearby table and began discussing with them her personal affairs.
The record leaves no doubt but that plaintiff concedes some of the above enumerated "incidents" occurred as alleged while at least one is refuted by the testimony of the children themselves and one or two appear to have been fully explained by plaintiff.
Plaintiff virtually concedes the occurrence of the incident regarding the dance revue. Without going into detail we think it suffices to say her tendered explanation of the event does not reveal her behavior on this occasion to be entirely rational. Plaintiff readily concedes the frequent loud arguments and physical encounters with defendant wherein each has struck the other on more than one occasion and further that plaintiff has at times struck defendant with objects in self-defense. Plaintiff, of course, charges that defendant's overbearing attitude was the principal cause of these altercations and to some extent she is corroborated therein by the testimony of the three children who considered their mother was primarily at fault but reluctantly admitted their father provoked some of these incidents. Plaintiff further admits police were frequently summoned to the home while the family was living in Pennsylvania but contends that defendant deliberately called the police in an effort to humiliate plaintiff to the extent plaintiff would leave. Regarding the laundry incident plaintiff contends that she had an arrangement with the laundress whereby at any time the laundry could be left on the latter's porch and plaintiff having brought the laundry along felt that it should have been delivered that night irrespective of the hour. On the other hand, the testimony of defendant is that the hour was late and he felt that the children should be brought home as they had to attend school the next day and under the circumstances, he did not feel justified in driving several miles out of the way. He conceded, however, that if he had acceded to plaintiff's *492 request plaintiff would not have become disturbed and no scene would have resulted. No satisfactory explanation appears in the record regarding the reason why plaintiff spent at least one night in the family automobile with at least one of the children. The accusation that plaintiff refused to permit the children to engage in normal childhood pursuits is without foundation in the record. It appears by the testimony of the three older children that they were required to take music and dancing lessons; that they attended school and church as other children; that they were allowed to attend birthday parties and were given parties on their own birthdays; that they were permitted and encouraged to join organizations such as the YWCA and other youth movements and that their friends were permitted to visit in their homes. It appears, however, that at times plaintiff required the children to practice their piano lessons before breakfast much to their annoyance. The record as a whole convinces us that although plaintiff may have tended toward a policy of "strictness" in governing the conduct of her children she nevertheless permitted them to indulge in normal childhood activities while at the same time insisting that their education and training in culture and the arts not be neglected. While it may well be that there were times when plaintiff demanded that the children practice their piano or dancing lessons in preference to other activities of their own choice, her actions in this regard do not strike us as rendering her unsuitable to retain their custody. With respect to the charge that plaintiff was a poor housekeeper and would not fix meals, the evidence shows that about two months after the birth of Barbara Ann, plaintiff again became pregnant which occurrence upset and distressed both plaintiff and defendant to considerable degree. For reasons which it would serve no useful purpose to mention here, the foetus was lost and plaintiff subsequently became pregnant for the youngest child Deborah Lynn. During these two pregnancies (while the family was residing in Pennsylvania) it is shown that it was necessary for the family to eat out quite a lot especially at night not only because of plaintiff's emotional disturbance but also because of the many activities indulged in by the children such as dancing lessons, swimming instructions and other events which transpired in the afternoon. It also appears that during this period it was frequently necessary for the husband and children to fix their own breakfast.
In explanation of the incident in which she was alleged to have stepped on the child, Barbara Ann, plaintiff testified that an altercation was precipitated by the child who insisted upon attending school clad in bluejeans and a boy's shirt contrary to plaintiff's express instructions. According to plaintiff when the child attempted to leave home so attired plaintiff did in fact forcibly restrain her from so doing and concedes that in the struggle which developed she may have accidentally trod upon her daughter.
Concerning plaintiff's public accusations of defendant's living in adultery with his second wife, plaintiff acknowledges that she made statements questioning the validity of defendant's Pennsylvania divorce, but denies she used the word "adultery" and further contends that such statements were not made in the presence of any of the children. In this regard the three girls readily concede they did not hear their mother utter these statements and further acknowledge that information concerning the occurrence came to them through friends and associates.
Concerning the incident in a Baton Rouge cafeteria in the course of a visitation by the children, plaintiff testified that on the occasion in question she became involved in an argument with Betty Jean who in a voice loud enough for others to hear, called plaintiff a "jack-ass" whereupon plaintiff turned to persons seated at the next table and began to discuss plaintiff's personal affairs.
At the time this matter was heard on the merits defendant had absolutely no income having been unemployed for a period of approximately four months. Although he had been offered laboratory employment at an annual salary of $15,000.00 per year *493 he had declined such position as being beneath his capabilities as an executive of plant managerial calibre. Since his re-marriage defendant and the four children lived in the home of and were supported by Mrs. Cocke. The home was apparently comfortable and enjoyed the services of a housekeeper and maid. All expenses of operation of the home were defrayed by Mrs. Cocke who gave each of the three older girls an allowance of $5.00 weekly. In addition to defendant, Mrs. Cocke and the four children, the home was also occupied by a 20 year old daughter of Mrs. Cocke by a prior marriage. It is further shown that at this time (now approximately three years ago) defendant then was considering two or three offers of employment and felt he would be re-employed in an executive position within a reasonably short time. Defendant was then absolutely without funds considering all of his assets had been impounded by virtue of an injunction obtained by plaintiff upon institution of this suit. Testimony of defendant, however, taken upon the last day of this extended matter indicates that Mrs. Cocke had left the home in Baton Rouge and taken up residence in Texas and that defendant was not certain whether or not she would return.
The testimony of the three children, Joan Barbara, Betty Jean and Barbara Ann, who are, at this writing approximately 21, 19 and 18 years of age, respectively, indicates that they consider their father has "done no wrong" in continuing to live with Mrs. Cocke (of whom these children are admittedly fond) even though defendant's divorce from plaintiff has been annulled. Their testimony reflects that defendant and their step-mother have fully explained to the children the events leading to the present situation leaving the children to draw their own conclusions therefrom or "judge for themselves". The three girls frankly stated that they did not condemn or think anything of the circumstances under which their father and stepmother were living feeling that since they were married in Mississippi the subsequent annulment of defendant's divorce should have no effect upon the validity of the second marriage. In this regard we wish to point out that defendant's attitude with respect to this issue is simply that since he was without work and had no available funds, continuation of his relationship with Mrs. Cocke was the only way he could provide a home and food, clothing and shelter for himself and his family. In short defendant rationalized the propriety of his conduct solely upon the basis of economic necessity. While it is not a function or duty of the court to serve as a censor of public morals the conduct of the parties to this litigation and the reasonable inferences arising therefrom must be considered in disposing of the all important question of custody involved herein.
We shall now proceed to discuss the medical evidence appearing in the record regarding the mental condition of appellant.
The testimony of Dr. Edward H. Williams, Psychiatrist, Miami, Florida, appears in the record in the form of answers to interrogatories propounded by plaintiff and cross-interrogatories posed by defendant. Dr. Williams was plaintiff's attending physician during plaintiff's hospitalization in Miami, Florida. He first saw plaintiff December 30, 1956, and recommended hospitalization which suggestion plaintiff rejected. Dr. Williams again saw plaintiff February 5, 1957, on which date plaintiff was admitted to the hospital under forcible restraint. Thereafter Dr. Williams saw plaintiff a total of 37 times at the institution between February 5, and May 3, 1957. He also saw plaintiff in his office April 10, and May 13, 1958. According to Dr. Williams plaintiff's condition was diagnosed as "anxiety reaction, severe, improved". Using the criteria "poor, fair, good and excellent", he considered plaintiff's prognosis "good" for the immediate future and "fair to good" for the prolonged future. Plaintiff's ability to care for her children was "excellent" with capable aid of a person of good education and experience in the rearing of children.
*494 Dr. George William Burke, formerly a member of the staff of the Southeast Louisiana Hospital, Mandeville, Louisiana, testified that plaintiff was suffering from schizophrenia reaction, paranoid type. Based upon hospital records in evidence and his personal knowledge of plaintiff while a patient at Mandeville, Dr. Burke stated that during confinement plaintiff was administered Thorozine which apparently produced little results consequently shock treatment was employed to alleviate plaintiff's condition. Upon discharge plaintiff was greatly improved and any psychotic symptoms plaintiff may have had were found to be in complete remission. Plaintiff's thinking was well oriented and organized and she was completely in touch with reality. At the time of plaintiff's admission to the hospital, Dr. Burke considered her prognosis to be "poor" whereas at the time of giving his testimony November 18, 1958, he considered plaintiff's prospects "fair" for a complete recovery. Dr. Burke also expressed the opinion that plaintiff was capable of caring for her children and especially so if assisted by a competent housekeeper. Although he admitted he could not state positively that plaintiff was fully and permanently cured, he attached considerable significance to the fact that despite the stress and strain of the prolonged and bitter trial, plaintiff has shown no symptoms of her former difficulty. He further stated that the longer plaintiff remained without a recurrence of her previous difficulty, the more favorable were her chances of a full and lasting recovery. Dr. Burke also expressed the opinion that even during her psychotic episodes he detected nothing which would indicate that plaintiff would be a source of potential harm or danger to others.
Plaintiff's contention the learned trial court improperly admitted the report of a social study made by the staff of the trial court is, in view of the record herein, without foundation. Exhibit "A-6", introduced in evidence November 18, 1958, is the report of a social study made by the Probation Officer attached to the trial court. In essence the report contains the findings of the Probation Officer as revealed by his investigation of the parties hereto. Quite obviously the report is made up primarily of hearsay testimony and had it been timely objected to would have been clearly inadmissible for that reason. The record reveals that with full knowledge and acquiescence of counsel for both parties, the trial court ordered the study conducted. It further appears that not only did counsel for plaintiff fail to object to its admission but also that counsel introduced the entire report himself. At Page 532, Volume III of the transcript we find the following:
"BY MR. HYNES: May it please the Court, to follow up that testimony, your Honor has the original social study.
"BY THE COURT: You need not offer it because I already have the original in which that list is made up, I understand.
"BY MR. HYNES: Well, may I refer to it. I'd like to have it as an exhibit there in connection with what it would cost her if the children are transferred to her.
"BY MR. KLEINPETER: Judge, I'm going to object to referring to any part of it unless he introduces the whole thing.
"BY MR. HYNES: I want to introduce the whole thing. I intend to.
"It is stipulated by and between counsel that the entire social study made by the Probation Officer of The Family Court in this case in reference to custody and alimony be admitted in evidence at this time, and be marked A-6.
"BY THE COURT: It will be incorporated. Now, you can refer to that if you wish to question him on it."
Subsequently (see Volume III, page 629 of the transcript) the following transpired:

*495 "BY MRS. MELLON: I understand that this social study is being used as additional evidence aside from what the attorneys in this case have to offer and I should like to know from Mr. Durr in what waywhat added information is to be offered through his social study.
"BY THE COURT: Well, of course, that can be detected from a comparison of the social study which is already in evidence together with the evidence adduced at the hearing. He, of course, is not here to justify the social study. It was ordered by the Court itself after a conference with both counsel.
"BY MR. KLEINPETER: Judge, I'd like the record to show that it was by consent of counsel and also the reservation of questioning Mr. Durr and also that the social study was put in the record on the suggestion and by consent of counsel, or between counsel, put in the record by Mr. Hynes as a Court exhibit.
"BY THE COURT: Proceed with the interrogation.
"BY MR. HYNES: Well, Your Honor, I'd like to answer that, that before Mr. Hynes put it in the record it was already in the possession of the Court."
The fact that the Probation Officer was present in court and testified during the trial would not have rendered admissible any hearsay portion of either his testimony or the report had counsel for plaintiff made timely objection thereto. Virtually everything with respect to which the probation officer testified and practically the entire report was predicated upon hearsay statements from other parties. We know of no authority upon which hearsay testimony may be received by a trial court in the course of a custody proceeding incident to a suit for judicial separation or divorce. Apparently, in ordering the social study the learned trial Court confused the instant matter with a juvenile proceeding pursuant to LSA-R.S. 13:1561 et seq. Notwithstanding the inadmissibility of the evidence in question, plaintiff having offered the evidence in her own behalf may not be heard to complain that it appears in the record.
From the facts and circumstances in evidence in the instant case, it would appear that if the children involved herein are permitted to remain in the custody of the father, they will reside in a home that is to all practical purposes run by a housekeeper and maid. It is clear that the nature of defendant's work is such that he is frequently required to be absent from home overnight and on weekends. In the event defendant and Mrs. Cocke should resume their relationship as husband and wife from the record it would appear that her principal concern would be operation of her dress shop and that she would, as a general rule, be in the home only after business hours. Moreover, under such circumstances the children would be placed in the custody of a parent residing with a second spouse to whom the parent was married under circumstances which render the marriage either illegal or the validity thereof highly questionable. Granted that the children (especially the three older girls) do not desire to live with their mother, it is, nevertheless, the settled jurisprudence of this state that awards of custody are not dependent upon the wishes or desires of the children. Peters v. Norris, 191 La. 436, 185 So. 461; Pierce v. Pierce, 213 La. 475, 35 So.2d 22.
Conceding that prior to her hospitalization in 1957 plaintiff's mental condition may have been such as to cast serious doubt upon her suitability as a person to be entrusted the care of her children, we are convinced that upon the date of the judgment rendered by the learned trial court herein, although plaintiff may not be said to have been fully recovered, she likewise has not been shown to be unfit by virtue of emotional *496 instability. It will be recalled that no issue has been made by defendant respecting plaintiff's moral fitnessthe sole question presented being the contention that plaintiff is unsuitable because of mental deficiency.
This being a matter of an initial custody award, the condition of the mother at the time of trial is the all important factor. We do not mean to imply that past conduct and circumstances are to be ignored and cast aside completely; but when dealing with an instance of the character involved herein, that is, where there is no charge of moral turpitude but only a question of mental capacity, the fact that a mother may have formerly been afflicted with emotional instability to the extent she was not then a proper person to have custody of children, such fact alone would not ipso facto deprive her of her paramount right to custody upon recovery from such disqualifying condition.
The testimony of Drs. Williams and Burke convinces us that at the time of trial plaintiff was remarkably improved and was capable of properly and adequately caring for her children, especially if assisted by an interested, experienced person. In this regard the evidence shows that plaintiff then had available the services of a capable, experienced housekeeper obtained by plaintiff's minister. The evidence further reflects that both plaintiff's parents were anxious and willing for plaintiff to reside with them in their home in Miami and that the residence was sufficiently commodious to accommodate all concerned.
We are not unmindful of the testimony of Dr. Burke to the effect that he cannot say plaintiff is fully and permanently recovered. Common knowledge and experience teaches that whereas it can never be said with certainty that a person suffering from mental illness is completely and permanently recovered, nevertheless, in many instances, persons afflicted with such a malady do affect such improvement and recovery as enables them to rejoin society and live normal lives. We believe that, in the instant case to hold plaintiff unfit to have custody of her children is to deprive of her such right not because of her present inability to properly care for them but solely because at some time in the past she may have been in such condition that at that time she might have been considered unfit.
In awarding custody to plaintiff herein we are fully apprised of the applicable cardinal rule of law that while the right of the mother to custody is paramount, it is not absolute and must yield to the principle that the best interest and welfare of the child is the chief concern of the court in a custody proceeding. We fail to see wherein the best interest of the children will in any way be jeopardized by awarding their custody to plaintiff. The oldest child, Joan, will, in a relatively short period of time, attain her majority. Betty Jean and Barbara Ann are presently approximately 20 and 19 years of age, respectively. It may well be that in the interval which has elapsed between the trial of this matter and the present time, all three of the older children have finished high school and are either married or self-supporting. If either of the foregoing speculations are true (and indeed if neither are a fact) it is obvious that the award of custody of children of such ages to either plaintiff or defendant will be of little consequence. On the other hand, there can be little question but that, granting the issue of suitability, the best interest of the 7 year old child, Deborah Lynn, will be served by placing her in the care of her mother. We detect nothing in the testimony of the medical experts who testified herein which would justify our concluding that placing these children in the custody of their mother will be inimical to their welfare and best interest. Moreover, who have carefully read and reread the testimony of plaintiff herein and find that it reflects a well oriented and orderly mind, an intellect completely in touch with reality and a mother who both loves her children and earnestly desires their custody.
In his brief learned counsel for plaintiff does not expressly raise the question of *497 alimony in the event plaintiff should be successful on this appeal. However, in the initial petition filed on behalf of plaintiff both custody of the children and alimony were prayed for and requested. Under the broad legal and equitable authority vested in us by virtue of Article 2164, LSA-C.C.P., we feel that the interests of justice will be served by remanding this matter to the trial court solely for the purpose of considering the alimony to which plaintiff appellant is entitled. Ordinarily this court would fix the amount of alimony predicated upon the record presently before us. However, in the instant case the testimony regarding plaintiff's needs and defendant's financial ability to respond in alimony is extremely remote in that it relates to a situation which existed some three years previous. Because of the unusual facts and circumstances surrounding this case and the reasonable probability that the situation reflected by the record before us has undergone considerable change since the trial of this matter, we feel that the interests of justice require reexamination of the respective positions of the parties before an award of alimony should be undertaken. Insofar as the record reflects we have no way of knowing defendant's present income or plaintiff's present needs or the degree of dependence of the two older children, Joan Barbara and Betty Jean.
For the reasons hereinabove set forth, it is ordered, adjudged and decreed that the judgment of the trial court awarding custody of the minors, Joan Barbara Lyckburg, Betty Jean Lyckburg, Barbara Ann Lyckburg and Deborah Lynn Lyckburg, to defendant, Berndt K. Lyckburg, be and the same is hereby annulled, rescinded, reversed and set aside and judgment rendered herein in favor of plaintiff, Marilyn J. Lyckburg, awarding her permanent care, custody and control of the minors, Joan Barbara Lyckburg, Betty Jean Lyckburg, Barbara Ann Lyckburg and Deborah Lynn Lyckburg, issue of said plaintiff's marriage to defendant, Berndt K. Lyckburg; costs of this appeal as well as all costs in the trial court to be paid by defendant, Berndt K. Lyckburg.
It is further ordered, adjudged and decreed that this matter be and the same is hereby remanded to the trial court for the sole purpose of fixing the amount of alimony due plaintiff, Marilyn J. Lyckburg.
Reversed and remanded.